1

2

3

4

5                        **NOT FOR CITATION OR PUBLICATION**

6                     IN THE UNITED STATES DISTRICT COURT

7

8                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

9   HAROLD H. HAWKS,                          No. C 05-02853 JSW

10              Petitioner,                    **ORDER DENYING PETITION**
                                              **FOR WRIT OF HABEAS CORPUS**
11       v.

12   ANTHONY P. KANE,

13              Respondent.
                                              /
14

15                              **INTRODUCTION**

16       Now before the Court is the petition for a writ of habeas corpus pursuant to 28 U.S.C. §

17   2254 filed by Petitioner Harold H. Hawks ("Hawks").  The petition is now ripe for consideration

18   on the merits, and, for the reasons set forth below, the Petition will be DENIED.

19                               **BACKGROUND**

20   **A.    Procedural History.**

21       On May 4, 1987, Hawks was convicted by a jury of one count of murder in the second

22   degree with the use of a firearm.  (Answer, Ex. 1.)  On June 2, 1987, Hawks was sentenced to an

23   indeterminate sentence of fifteen years to life, with a two year enhancement as a result of the use

24   of a firearm.  (*Id.*)  Hawks does not contest the validity of his conviction or his sentence.  Rather,

25   he seeks habeas relief on the ground that he has been denied parole unlawfully.

26       The hearing at issue in this Petition is Hawks' fourth suitability hearing, which was held

27   on November 19, 2003 (the "November 2003 hearing").  At that hearing, the Board found Hawks

28   unsuitable for parole and deferred a further hearing for a period of one year.

(Petitioner's Appendix ("Pet. App."), Ex. A at 119:5-124:1.)

On September 22, 2004, the Superior Court for the State of California, County of Riverside, denied Hawks' state habeas petition with respect to the November 2003 hearing on the grounds that (1) he failed to allege sufficient facts to establish a prima facie case for release and (2) the petition lacked merit. (Answer, Ex. 4.) On December 14, 2004, the state appeals court summarily denied his petition for a writ of habeas corpus. (*Id.*, Ex. 5.) On March 16, 2005, the California Supreme Court summarily denied review. (*Id.*, Ex. 6.)

On July 13, 2005, Hawks timely filed the instant petition. On March 29, 2006, the Court denied Respondent's motion to dismiss, in which Respondent contended that Hawks did not have a federally protected liberty interest in parole. (*See* Docket No. 20.) Respondent filed his Answer on May 18, 2006.[1] On June 16, 2006, Hawks filed his Traverse.

**B.   Factual Background.**

The following facts are derived from the exhibits submitted in support of the parties' pleadings in this case. Although Hawks does not challenge his conviction, the facts underlying that conviction are pertinent to the resolution of his habeas petition. As set forth in this Court's Order dated November 1, 2006 in the related case of *Hawks v. Hamlet* C-04-1822, the facts as found by the Court of Appeals are as follows:

> On the night of August 22, 1986, the murder victim and her friend were riding in a van driven by the formers [*sic*] husband. They were on their way to Riverside on the 91 Freeway to take the couple's son, who had been injured earlier, to the hospital. Hawks, who was upset after a disagreement with his estranged wife, was driving on the same freeway with his two year old son when a ... "traffic dispute" arose between the driver of the van and Hawks. And the latter had become very upset when, as he claimed, the van cut him off, forcing him off to the median and one of it's [*sic*] occupants threw an empty soda can at his car. Hawks then reached into his back seat and retrieved his shotgun, which he loaded with a slug and then fired once. The slug pierced the side of the van, hit the victim in the chest, killing her, exiting her body and lodging in the throat of her companion.

[1]   In his Answer, Respondent reserved his argument that there is no federally protected liberty interest in parole. (Answer, at p. 7 ¶ 15, p. 8 n.5.) For the reasons set forth in the Court's March 29, 2006 Order denying the motion to dismiss, the Court again rejects the argument that the petition should be denied on that basis. *See also Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1127-28 (9th Cir. 2006) (concluding that federally protected liberty interest in parole exists under California's parole scheme).

United States District Court

For the Northern District of California

1    (*See Hawks v. Hamlet*, C-04-1822, Order Denying Petition for Writ of Habeas Corpus at 3.)[2]

2         On February 25, 1997 (the "February 1997 hearing"), Hawks' initial parole suitability

3    hearing, a panel of the Board of Prison Terms ("Board") found Hawks unsuitable for parole and

4    deferred his next parole hearing for three years. (Pet. App., Ex. G at 65:8-67:14.)  The Board gave

5    the following reasons for its decision:

6            The first reason is the commitment offense which demonstrates a very callous
             disregard for the life and suffering of other human beings.  It was carried out
7            in a very dispassionate manner. ...

8            We find that you've had a previous history of problems with alcohol.  You
             were having some unstable relationships with your wife in particular during
9            this period of time.  And so those are also of concern to the panel.

10   (Pet. App., Ex. G at 65:8-66:13.)  The Board did commend Hawks for his positive behavior while

11   incarcerated: "You've remained disciplinary free.  You've done a wonderful job of upgrading

12   educationally and you've been doing very well, putting good use to your time."  The Board, however,

13   concluded that these favorable factors did "not outweigh those factors of unsuitability." (*Id.* at 66:5-

14   12.)  The Board deferred his next parole hearing for three years and recommended that Hawks

15   remain disciplinary free, upgrade both vocationally and educationally, continue to participate in

16   Alcoholics Anonymous, and continue to participate in therapy.  (*Id.* at 66:25-67:14.)

17        According to the record, Hawks followed the Board's recommendation to obtain more

18   therapy.  His request was denied because, in the view of the staff psychologist, "Inmate Hawks

19   neither requires additional psychotherapy nor do we have those resources available at this time."

20   (Pet. App. A, Ex. BB at 00050.)  By the time of the November 2003 hearing, Hawks was

21   participating in a "Lifers Group" and progressed well in that group.  Dr. Howlin, a staff psychologist,

22   noted that "[r]esearch has demonstrated that individuals involved in this type of group therapy have a

23   decreased chance of recidivism.  I would expect Mr. Hawks to be no exception."  (Pet. App., Ex. B

24   at 00127.)

25

26

27        [2]    Although not set forth in the statement of facts, the record shows that the
     woman Hawks killed was an off-duty law enforcement officer.  (*See, e.g.,* Pet. App., Ex. A at
28   49:16-18, 79:14-18.)

**United States District Court**

For the Northern District of California

1    At his second suitability hearing, held on October 31, 2000 (the "October 2000 hearing"), the

2    Board again found Hawks unsuitable for parole and again found that Hawks would pose an

3    unreasonable risk of danger to society and a threat to public safety if released.  The Board deferred

4    his next hearing for two years.  (Pet. App., Ex. G at 93:3-95:22.)  The Board gave the following

5    reasons for its decision:

6        The commitment offense was carried out in an especially cruel manner.
         Multiple victims were attacked and injured. ... The offense was carried out in
7        a manner which demonstrates exceptionally callous disregard for human
         suffering and the motive of the crime was inexplicable or at least very trivial
8        in relation to the offense. ...

9        In his parole plans, he does have — seem to have viable residential plans in
         the last county of legal residence.  He does not have current proof of
10       acceptable employment plans, although there are older letters in the file.

11       And the hearing Panel notes that responses to PC 3042 notices indicate
         opposition to a finding of parole suitability, specifically from the District
12       Attorney of Riverside County and also Correctional Counselor Madison
         writes that this inmate was a moderate degree of threat if released to the
13       public.

14   (*Id.* at 93:12-94:24; *see also* Pet. App. A, Ex. CC at 000058 (Life Prisoner Evaluation Report).)

15       At the October 2000 hearing, the Board considered a psychological report from Dr. Joe Reed,

16   a staff psychiatrist, in which Dr. Reed opined that Hawks' "violence potential within a controlled

17   setting is considered to be significantly below average relative to the level II inmate population."  Dr.

18   Reed also opined that Hawks' potential for violence would "be no more than the average citizen."

19   (Pet. App. A, Ex. BB at 000048.)  Dr. Reed also noted that Hawks stated that "he would attend more

20   psychological groups if they were currently available at CTF."  (*Id.* at 000047.)  Finally, Dr. Reed

21   noted in his report that Hawks "showed excellent insight into his poor anger control problem and

22   alcohol abuse problem.  He showed excellent empathy towards the damage done to the victims and

23   seemed genuinely penitent for his crime."  (*Id.* at 000048.)

24       Despite this report, the Board found that Hawks "does need therapy in order to face, discuss,

25   understand and cope with stress in a nondestructive manner.  He also needs to fully develop the

26   causative factors, or ... more fully understand the causative factors which led to this crime and

27   explore his full culpability in this crime, and until progress is made, the prisoner continues to be

28   unpredictable and a threat to others."  (Pet. App., Ex. G at 94:25-95:7.)  The Board also noted that

4

Hawks "does not have a previous record.  Institutionally, he's done very well.  We'll mention that in detail, but he has, in the determination of the Board, has not yet sufficiently participated in beneficial self-help and therapy programming."  (*Id.* at 94:8-13; *see also id.* at 95:7-16 (noting Hawks had been disciplinary free for his entire period of incarceration and outlining specific positive actions taken).)  Although commending him for taking these steps, the Board again found the "positive aspects of his behavior do not yet outweigh his factors of unsuitability."  (*Id.* at 95:16-18.)  The Board recommended that Hawks remain disciplinary free, continue to upgrade vocationally, and to participate in whatever self-help and therapy programming he might be able to participate.  (*Id.* at 96:25-97:4.)

On September 27, 2002, the Board conducted Hawks's third suitability hearing (the "September 2002 hearing").  Once again, the Board found Hawks unsuitable for parole and denied consideration for one year.  The Board's decision to deny parole was based "first and foremost" on the fact that the "offense was carried out in a cruel manner with callous disregard for human suffering."  (*Id.* at 103:22-25).  The Board also relied on the fact that the District Attorney and the victims' next of kin opposed parole.  Finally, the Board determined that Hawks required more therapy and programming.[3]  (*Id.* at 104:25-105:7.)

On November 19, 2003, the Board conducted Hawks' fourth suitability hearing.  The Board relied on the statement of facts set forth in an October 2002 Life Prisoner Evaluation Report.  (*See* Pet. App., Ex. A at 10:21-12:25; Answer, Ex. 2.)  The Board again denied parole.  The Board's decision was relayed by Presiding Commissioner Welch as follows:

> *[T]he offense was carried out in an especially cruel and callous manner*, multiple victims were attacked and one was killed.  When I say multiple victims were attacked, there was more than one person in the car and one of the victims was killed and one was seriously injured.  The offense was carried out in a dispassionate manner.  The offense was carried out in a manner that demonstrates an extremely callous disregard for the laws and the rules that's [*sic*] put into effect to govern any well ordered society, it shows total callous disregard for the laws and rules that's [*sic*] established

---

[3]    The September 2002 hearing was the subject of Hawks' petition for writ of habeas corpus in *Hawks v. Hamlet*, C-04-1822-JSW.  Although the Court denied that petition, it concluded that the Board's finding that Hawks required further therapy was not supported by some evidence.  (*Hawks v. Hamlet*, C-04-1822, Order Denying Petition for Writ of Habeas Corpus at 18:2-25.)

*United States District Court*

*For the Northern District of California*

United States District Court

For the Northern District of California

to keep our highways safe, and also it shows a callous disregard for another human being to fire a weapon at a moving vehicle.  The motive for the crime was inexplicable and it was trivial.  It was trivial.  The conclusion was drawn from the Statement of Facts wherein on August 22, 1986, the prisoner did shoot Patricia Dwyer with a shotgun and they were traveling and apparently it was road rage, I guess is the best way to describe it.  There was an encounter with the victim's automobile.  The prisoner removed a shotgun, took the time to load it, (inaudible) aimed it at the van, fired it and the bottom line is Patricia Dwyer was struck with it, with the bullet that was fired, and another passenger in the car was also struck, and Ms. Dwyer lost her life as a result of the incident.  The prisoner did not have a major criminal history, in fact, there was no indication of a criminal history, there was no assaultive behavior, there was no other type of behavior noted.  There's no indication that the prisoner had an unstable social history with the exception of his own testimony today that his family suffered from alcoholism.  But other than that it appeared that the prisoner had a pretty stable social history.  The prisoner has programmed.  The recent psychological report shows that the prisoner is making progress, shows that his level of dangerousness both in a structured environment as well as an unstructured environment such as the free community is reduced.  The last full psychological evaluation was completed, I believe that was back in 2000, and at that time the author of the report, Dr. Joe Reed, cites that the prisoner's violence potential in a controlled setting is significantly below average level II inmate population.  If released to the community, seemingly his violence potential is considered to be no more than the average citizen.  So certainly the prisoner is making progress in that area from a psychological perspective.  The prisoner does have parole plans.  In fact the prisoner have [*sic*] well over 100 letters in his file supporting his release, there's residential plans, there's employment plans.  *The Hearing Panel notes that in response to Penal Code 3042 Notices indicate an opposition to a finding of suitability, the District Attorney spoke in strong opposition to a finding of suitability.  Two of the victim's relatives was [sic] here, her daughters, they spoke in opposition of a finding of suitability at this time.*

The Panel makes the following findings: *The Panel finds that the prisoner should continue in the mode that he's in.  He should continue to participate in positive kinds of programs.  He should continue to participate in the kinds [sic] of programs that would enable him to go out in society and be able to face stressful situations like the one he encountered on the night of the incident – of the instant offense.*  And hopefully that he'll be able to face those type of things and be able to discuss stressful situations, understand, and cope in a nondestructive manner.  *Until enough progress is made, the prisoner continues to be unpredictable and somewhat of a threat.*  Nevertheless, there's just an array of things we want to commend the prisoner for.  Certainly, the prisoner has been a very good prisoner, he has programmed in prison.  He doesn't have any write-ups of a disciplinary standpoint, he has participated in some vocational and educational programs and we think that's significant.[4]  However, those positive programs does [*sic*] not outweigh

---

[4]      Indeed, Hawks has participated in "some" educational programs.  He has completed an Associate of the Arts Degree from Hartnell College, a Bachelor's degree from Indiana University, and a Master's degree from California State University Dominguez Hills.

the factors of unsuitability.  Parole is going to be denied for one year.
Certainly the crime plays a major role in the one-year denial.  We
recommend that the prisoner remain disciplinary free, that he continue to
participate in positive kinds of programs, whether it be educational or
vocational or self help programs.  Certainly we feel that substance abuse
should be an ongoing thing, that he should continue to participate in that,
make it a life long commitment. ... [O]h, we are going to request a new
psychological evaluation, and we'll ask the clinician again to look at the
prisoner's violence potential in the free community, the significance of
alcohol and drugs as it relates to the instant offense and an estimation of
the prisoner's ability to refrain from the use of these substances, the extent
to which the prisoner has explored the commitment offense and comes to
terms with the underlying causes, and whether there is any need for any
type of treatment while incarcerated before being found suitable.

(Pet. App., Ex. A at 115:22-120:1 (emphasis added).)

**GROUNDS FOR RELIEF**

Although Hawks raises a number of arguments in his Petition, the essence of his claim is that

his "Due Process rights have been violated by the [Board's] repeated refusal to grant parole despite

[his] federally protected liberty interest" therein.  (Pet. Mem. at 34.)[5]

**ANALYSIS**

A.     **Standard of Review.**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in

custody pursuant to the judgment of a state court only on the ground that he is in custody in violation

---

(*See* Memorandum in Support of Petition ("Pet. Mem.") at 18-19; Pet. App., Ex. DD.)

    [5]     Hawks also relies on *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and
*Blakely v. Washington*, 542 U.S. 296 (2004) to argue that the Board's decision to deny him
parole violates his due process rights.  This argument is premised on Hawks' contention that
the Board cannot rely on facts not found by the jury to increase his sentence.  The Court finds
that Hawks' claim based on the *Apprendi-Blakely* doctrine is plainly meritless.  *Apprendi* and
*Blakely* address the ability of a judge to increase a maximum sentence based on facts that are
not found by a jury or stipulated to by the defendant.  *See Apprendi*, 530 U.S. at 490 (holding
that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime
*beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a
reasonable doubt") (emphasis added); *Blakely*, 542 U.S. at 303 (noting that "the 'statutory
maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on
the basis of the facts reflected in the jury verdict to admitted by the defendant") (emphasis
omitted).  Here, Hawks was sentenced to fifteen years to life, with a two year enhancement.
Thus, his maximum sentence is life.  By determining whether or not to grant parole, the
Board is not increasing his penalty beyond the statutory maximum.  *Apprendi* and *Blakely* are
inapposite to Petitioner's challenge to the Board's parole determination, and the Petition is
DENIED to the extent it rests on this argument.

United States District Court

For the Northern District of California

of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also Rose v. Hodges*, 423 U.S. 19, 21 (1971). Because the petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEPDA's provisions apply. *Jeffries v. Wood*, 103 F.3d 827 (9th Cir. 1996) (en banc).

Under AEPDA, this Court may grant the petition with respect to any claim that was adjudicated on the merits in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Williams (Terry) v. Taylor*, 529 U.S. 362, 413 (2000) (hereinafter "*Williams*"). Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d). *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003). It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412; *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time of the state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001). "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. The Supreme Court has explained repeatedly that AEDPA, which embodies deep-seated principles of comity, finality, and federalism, establishes a highly deferential standard for reviewing state-court determinations. *See id.* at 436. Thus, that Court has emphasized that "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

United States District Court

For the Northern District of California

1    Under the "contrary to" clause of section 2254(d)(1), a federal court may grant the writ only

2    if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases,

3    'or if it confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme

4    Court and nevertheless arrives at a different result." *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting

5    *Williams*, 529 U.S. at 405-06). Under the "unreasonable application" clause of section 2254(d)(1), a

6    federal court may grant the writ if the state court identifies the correct governing legal principle from

7    the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's

8    case. *Williams*, 529 U.S. at 413.

9    A federal habeas court "may not issue the writ simply because that court concludes in its

10   independent judgment that the relevant state-court decision applied clearly established federal law

11   erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412. The

12   objectively unreasonable standard is not a clear error standard. *Lockyer*, 538 U.S. at 75-76; *Clark v.*

13   *Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003). After *Lockyer*, "[t]he

14   writ may not issue simply because, in our determination, a state court's application of federal law

15   was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not

16   self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the

17   Ninth Circuit] ha[s] previously afforded them." *Clark*, 331 F.3d at 1068.

18   In determining whether the state court's decision is contrary to, or an unreasonable

19   application of, clearly established federal law, a federal court looks to the decision of the highest

20   state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*,

21   217 F.3d 663, 669 n.7 (9th Cir. 2000). If the highest state court has summarily denied a petitioner's

22   claim, the habeas court may "look through" that decision to the last state court addressing the claim

23   in a reasoned decision. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing

24   *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

25   The standard of review under AEDPA is somewhat different where the state court gives no

26   reasoned explanation of its decision on a petitioner's federal claim and where there is no reasoned

27   lower court decision on the claim. In such a case, a review of the record is the only means of

28   deciding whether the state court's decision was objectively reasonable. *See Hines v. Thompson*, 336

United States District Court

For the Northern District of California

1   F.3d 848, 853 (9th Cir. 2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir. 2002).  Therefore,

2   while a state court decision on the merits concerning a question of law normally should be afforded

3   respect, "[i]f there is no such decision on the merits ... there is nothing to which to defer."  *Greene*,

4   288 F.3d at 1089.  In this case, the Superior Court denied Hawks' state petition using a preprinted

5   form and found that Hawks "failed to allege sufficient facts to state a prima facie case" for his

6   release and that the "Petition lacks merit."  (*See* Answer, Exs. 4-6.)  The Court concludes that there

7   is no "reasoned" decision the merits.  Accordingly, the Court has conducted an independent review

8   of the record.  *See Sass v. Board of Prison Terms*, 461 F.3d 1123, 1126 (9th Cir. 2006) (conducting

9   independent review of record because state court did not explain reasoning when it found only that

10  petitioner "failed to set forth sufficient facts to establish a prima facie case for relief").

11          The Ninth Circuit has applied § 2254(d) to review of parole suitability decisions.  *See Rosas*

12  *v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); *see also McQuillion v. Duncan*, 306

13  F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that AEDPA deferential standard of review

14  under section 2254 applies to such decisions).

15  **B.      Legal Standards Applicable to Parole Suitability Determinations.**

16          California's parole scheme is set forth in California Penal Code § 3041, *et seq.*  Section

17  3041(a) provides, in pertinent part:

18          In the case of any inmate sentenced pursuant to any provision of law ... [o]ne
            year prior to the inmate's minimum eligible parole release date a panel of two
19          or more commissioners or deputy commissions shall again meet with the
            inmate and shall normally set a parole release date as provided in Section
20          3041.5. ... The release date shall be set in a manner that will provide uniform
            terms for offenses of similar gravity and magnitude in respect to their threat
21          to the public, and that will comply with the sentencing rules that the Judicial
            Council may issue and any sentencing information relevant to the setting of
22          parole release dates.

23  Cal. Pen. Code § 3041(a).

24          Penal Code section 3041(b) provides in pertinent part:

25          The panel or board shall set a release date unless it determines that the gravity
            of the current convicted offense or offenses, or the timing and gravity of
26          current or past convicted offense or offenses, is such that consideration of the
            public safety requires a more lengthy period of incarceration for this
27          individual, and that a parole date, therefore, cannot be fixed at this meeting.

28  Cal. Penal Code § 3041(b).

10

United States District Court

For the Northern District of California

Title 15 of the California Code of Regulations section 2402 (hereinafter "Section 2402") sets forth the criteria for determining whether an inmate is suitable for release on parole. The opening paragraph of section 2402(a) states:

> Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

15 Cal. Code Regs. § 2402(a).

Section 2402(b) of these regulations provides:

> All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any considerations of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

*Id.* § 2402(b).

Circumstances tending to show unsuitability for parole are:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

11

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

*Id.* § 2402(c).

Circumstances supporting a finding of suitability for parole are:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands that nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was a result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the possibility of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9)  Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

*Id.* § 2402(d).

The regulations also contain a matrix of suggested base terms depending on the murder degree and the circumstances surrounding the murder.  The matrix provides three choices of

**United States District Court**

For the Northern District of California

1  suggested base terms for several categories of crimes.  *See id.* § 2403.  For second degree murders,

2  the matrix of base terms ranges from the low of 15, 16, or 17 years, to a high of 19, 20 or 21 years,

3  depending on some of the facts of the crime.[6]

4      Although the matrix is to be used to establish a base term, an inmate's base term is set only

5  when he or she has been found suitable for parole.  *See Dannenberg*, 34 Cal. 4th at 1087.  Thus, the

6  statutory scheme places individual suitability for parole above a prisoner's expectancy in an early

7  setting of a fixed date designed to ensure term uniformity.  *Id.* at 1070-71.

8          While subdivision (a) of section 3041 states that indeterminate life (i.e., life-
           maximum) sentences should "normally" receive "uniform" parole dates for
9          similar crimes, subdivision (b) provides that this policy applies "*unless* [the
           Board] determines" that a release date cannot presently be set because the
10         particular offender's crime and/or criminal history raises "*public safety*"
           concerns requiring further indefinite incarceration.  (Italics added.)  Nothing
11         in the statute states or suggests that the Board must evaluate the case under
           standards of term uniformity before exercising its authority to deny a parole
12         date on the grounds the particular offender's criminality presents a *continuing
           public danger.*

13
14  *Id.* at 1070 (emphasis, brackets, and parentheses as in original).

15      In sum, "the Board, exercising its traditional broad discretion, may protect public safety in

16  each discrete case by considering the dangerous implications of a life-maximum prisoner's crime

17  individually."  *Id.* at 1071.  The California Supreme Court's determination of state law is binding in

18  this federal habeas action.  *See Hicks v. Feiock*, 485 U.S. 624, 629 (1988); *Sandstrom v. Montana*,

19  442 U.S. 510, 516-17 (1979).

20      The California Supreme Court also has determined that the facts of the crime can alone

21  support a sentence longer than the statutory minimum even if everything else about the prisoner is

22  laudable.  "While the board must point to factors beyond the minimum elements of the crime for

23  which the inmate was committed, it need engage in no further comparative analysis before

24  _____

25      [6]    One axis of the matrix concerns the relationship between murderer and victim
        and the other axis of the matrix concerns the circumstances of the murder.  The choices on
26  the axis for the relationship of murderer and victim are "participating victim," "prior
        relationship," and "no prior relationship."  The choices on the axis for the circumstances of
27  the murder are "indirect," "direct or victim contribution," and "severe trauma."  Each of the
        choices are further defined in the matrix.  *See* 15 Cal. Code Regs. § 2403(c).

28

13

concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." *Dannenberg*, 34 Cal. 4th at 1071; *see also In re Rosenkrantz*, 29 Cal. 4th 616, 682-83 (2002), *cert. denied*, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

**C.     The Board's Decision to Deny Hawks Parole Did Not Violate His Due Process Rights.**

Hawks asserts that the Board's decision to deny him parole at the November 2003 hearing violated his due process rights. "In analyzing the procedural safeguards owed to an inmate under the Due Process clause, [a court] must look to two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural safeguards." *Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir. 2003). The second prong of this test is satisfied if (1) the inmate has been afforded an opportunity to be heard and, if denied parole, informed of the reasons underlying the decision and (2) "some evidence" supports the decision to grant or deny parole. *See Sass*, 461 F.3d at 1129; *Jancsek v. Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987).[7]

**1.     The Board's Decision Was Supported by Some Evidence.**

The Court already has determined that Hawks has a constitutionally protected liberty interest in parole. Further, Hawks does not contend that he was denied an opportunity to be heard or that he was not provided with the Board's reasons for denying parole. As such, the Court only looks to whether there is "'some evidence' having 'some indicia of reliability'" to support the Board's decision. *See Sass*, 461 F.3d at 1128-29; *see also Biggs*, 334 F.3d at 915. The Board's decision also must reflect consideration of each inmate's particular circumstances. *See, e.g., Rosenkrantz*, 29 Cal.

---

[7]     The parties each state that the some evidence standard is not the appropriate standard by which to evaluate the Board's decision. In *Sass*, however, the Ninth Circuit continued to apply that standard. *Sass*, 461 F.3d at 1128-29. The *Sass* court also rejected the argument Respondent makes here, namely that the some evidence standard is not "clearly established in the parole context." *Id.* at 1129.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   4th at 677 (Board's decision "must reflect an individualized consideration of the specified criteria and

2   cannot be arbitrary and capricious").

3           The Supreme Court has explained that compliance with the "some evidence" standard "does

4   not require examination of the entire record, independent assessment of the credibility of witnesses,

5   or weighing of the evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985); *Sass*, 461 F.3d at

6   1128 (noting "*Hill*'s some evidence standard is minimal and assures that 'the record is not so devoid

7   of evidence that the findings of the disciplinary board were without support or otherwise arbitrary'").

8   Rather, the Court is required only to determine whether there is any evidence in the record that could

9   support the Board's decision. *Hill,* 472 U.S. at 445.

10          Hawks contends that the Board's decision to find him unsuitable for parole is not supported

11  by some evidence.  As set forth above**,** at the November 2003, hearing, the Board found Hawks'

12  unsuitable for and denied him parole because of (1) the nature of the commitment offense; (2) the

13  opposition from the District Attorney and the next of kin; and (3) its conclusion that Hawks needed

14  to complete more programming, because until further progress was made in that regard, Hawks

15  continued to be unpredictable and somewhat of a threat.  With respect to this last finding, the Board

16  concluded it was appropriate to order a new psychological report.

17                  **a.      Nature of the offense.**

18          As it did at the September 2002 hearing, the only Section 2042 factor on which the Board

19  relied in finding Hawks unsuitable for parole was that the offense was "committed ... in an especially

20  heinous, atrocious or cruel manner."  15 Cal. Code Regs. § 2402(c)(1).  Although the Board did not

21  cite verbatim from this regulation in issuing its decision, it stated that "the offense was carried out in

22  an especially cruel and callous manner, multiple victims were attacked and one was killed, ... and the

23  offense was carried out in a dispassionate manner," all of which are factors to consider in evaluating

24  whether the commitment offense was committed in an "especially heinous, atrocious or cruel

25  manner."  *Id.* § 2402(c)(1)(A)-(E).  It appears that the Board drew its factual support for these

26  conclusions from the statement of facts contained in the probationary report, rather than from the

27  findings of the appellate court.  (Pet. App., Ex. A at 116:13-17.)

28

It is undisputed that multiple victims were involved and that one was critically injured and one was killed. It also is undisputed that Hawks consumed between six to eight beers before he got into his van with his two year old son. (*Id.* at 14:23-15:3, 59:6-8.) In addition to having consumed alcohol, Hawks acknowledged that he was angry as a result of an argument he had with his estranged wife. (*Id.* at 14:17-25.) At this hearing, Hawks again stated that during the altercation with the driver of the van in which the victims were riding, he was run off the road into the median and that his child was dislodged from his car seat. Instead of letting the matter drop at that point, Hawks stated that he got his car under control and tried to catch up to the van, purportedly to show the driver that he had a child in his car. (*Id.* at 15:13-16:11.)

While he was still driving, Hawks reached around his seat, loaded his gun with what turned out to be a slug and shot at the victims' van. Although Hawks may have intended only to scare the driver of the van with a warning shot, his shot pierced the van and killed one woman and severely injured another. (*Id.* at 16:12-20; *see also id.* at 79:27-82:3 (sentencing statement from Ms. Varga, describing her injuries and recovery).)[8] The Court does find that the Board's finding that the commitment offense was dispassionate is not supported by some evidence. Indeed, as the Board itself acknowledged, the incident apparently occurred because of "road rage." (*Id.* at 116:13-17.) Furthermore, even if the Board erred in concluding that the manner in which the offense was committed showed an exceptionally callous disregard for human suffering, the facts recited above do support the Board's findings that multiple victims were attacked and that the motive for the crime was trivial in relation to the offense.

It is not this Court's province to independently assess of the credibility of witnesses or weigh the evidence presented to the Board. *Hill*, 472 U.S. at 455; *Sass*, 461 F.3d at 1128. As such, the Court concludes that the Board's decision to deny Hawks parole based on the facts of the offense is supported by some evidence.

//

//

---

[8] The record indicates that Ms. Varga committed suicide at some point after the incident. (Pet. App., Ex. A at 79:21.)

United States District Court

For the Northern District of California

1

**b.        Opposition from the District Attorney**

2          At the November 2003 hearing, the Board again relied on the fact that the District Attorney

3   and Ms. Dwyer's next of kin opposed parole to determine that Hawks was not suitable for release.

4   (*Id.* at 118:1-8.)

5          California Penal Code section 3043 provides:

6          The Board, in deciding whether to release the person on parole, shall consider
           the statements of the victim or victims, next of kin, immediate family
7          members of the victim, and the designated representatives of the victim or
           next of kin, if applicable, made pursuant to this section and shall include in
8          its report a statement of whether the person would pose a threat to public
           safety if released on parole.

9

10  Cal. Pen. Code § 3043(e).  In addition, the Board is required to give notice to the

11         district attorney of the county in which the offense was committed, the law
           enforcement agency that investigated the case, and where the prisoner was
12         convicted of the murder of a peace officer, the law enforcement agency which
           had employed that peace officer at the time of the murder.

13

14  *Id.* § 3042(a).

15          Although the fact that the next of kin or the District Attorney may oppose release is not

16  listed in the regulations regarding suitability and unsuitability, the provisions of the Penal Code

17  require the Board to consider statements given by such officials or persons when it renders a decision

18  on an inmate's suitability, or lack thereof, for parole.  *Id.* § 3046(c); *see also Dannenberg*, 34 Cal.

19  4th at 1084-85 (noting that "obvious purpose of these statutes is to guarantee that the Board has fully

20  addressed the public safety implications of releasing *each individual life-maximum inmate* on parole

21  *before it decides to do so*") (emphasis in original).  The record supports the Board's conclusion that

22  the District Attorney and the next of kin opposed parole.  (Pet. App., Ex. A at 79:9-85:24, 86:13-

23  87:5, 104:24-114:13.)[9]  Consequently, the Board's decision to deny parole relying on that opposition

24  is supported by some evidence.

25  //

26  //

27  _____

28         [9]        The District Attorney's statement in opposition rests largely on the facts of the
    commitment offense.  (*See, e.g.,* Pet. App., Ex. A at 79:14-83:8.)

17

**United States District Court**

For the Northern District of California

1          c.        **Need for continued therapy and programming.**

2          The Court previously concluded that the Board's findings that Hawks required additional

3    therapy and programming was not supported by some evidence. (*See Hawks v. Hamlet*, C-04-1822,

4    Order Denying Petition at 18-19.) The Court again finds the Board's decision to deny Hawks' parole

5    on this basis is not supported by some evidence. Hawks began participating in therapy in 1992 and

6    has done so throughout his term of incarceration. By the time of the September 2002 hearing,

7    Hawks had successfully completed two Life Skills courses, an Impact Workshop, an Anger

8    Management course, and a Parents Education Program. He also participated in a Father's group and

9    has participated in Alcoholics Anonymous for twelve years. Indeed, the Counselor who prepared the

10   report in anticipation of the November 2003 hearing concluded that Hawks was "a low degree of

11   threat to the public at this time, if released from prison." (*See* Pet. App., Ex. C; Pet. App. A, Exs.

12   AA-CC.)

13         Furthermore, Staff Psychologist Bakeman twice has rejected Hawks's request for more self-

14   help therapy, noting that "Inmate Hawks has requested additional psychotherapy as mandated by the

15   Board of Prison Terms (BPT). Inmate Hawks neither requires additional psychotherapy nor do we

16   have those resource available at this time." (Pet. App. A, Ex. BB at 000050.) Dr. Reed found that

17   Hawks "showed excellent insight into his poor anger control problem and alcohol abuse problem.

18   He showed excellent empathy towards the damage done to the victims and seemed genuinely

19   penitent for his crime." (*Id.* at 000048.) Although staff psychologists have determined he does not

20   require more therapy, Hawks has continued to seek it out and at the time of the November 2003

21   hearing, was participating in the Lifer's Group. (Pet. App., Ex. A at 32:9-33:10.) The record

22   establishes that he did well in that group. (*Id.*)

23         The Court finds that the Board's decision to deny Hawks' parole based on the need for more

24   programming and therapy is not supported by some evidence. This conclusion is further reinforced

25   by the psychological report prepared following the November 2003 hearing, in which Dr. Sexton

26   stated:

27              Three complete psychological evaluations have been presented to the
                Board of Prison Terms over the duration of this inmate's incarceration. ...
28              All of these reports have been consistent and indicate no mental health

disorder.  All of the reports have indicated that the inmate had an alcohol problem that needed treatment.  As a result, the inmate has participated in AA treatment programs since 1990.

None of the previous clinicians recommended continued self-help or therapy programs. ...

It is obvious from the above diagnostic impression that there is no psychiatric reason for the inmate not to be paroled.  In fact, his psychiatric condition is unchanged from his last Board of Prison Terms hearing.  Further, due to his general stability, it is unlikely that his mental status will be altered unless one of the following should occur: Pre-senile dementia due to old age, a general medical condition causing injury to the brain, or trauma causing injury to the brain.  *In the absence of these new developments, which would be obvious to the Board of Prison Terms, further psychological reports would be redundant and of little clinical value. ...*

In response to the direct questions from the Board of Prison Terms, ... [t]he second question is the prisoner's violence potential in the free community.  *My findings are consistent with the previous reports.*  Due to the inmate's exemplary performance while incarcerated, his lack of a mental illness, and resolved substance abuse issues, he is viewed as having no greater violence potential than the average non-offender population in the community.  *He was viewed as being below average for the typical parolee....*

The final question asked by the Board of Prison Terms was the need for further therapy.  *It should be obvious from the lack of recommendations for further therapy by all previous clinicians, and the inmate's completing of 14 self-help programs and one-to-one therapy with three different clinicians that no further therapy programs while incarcerated are indicated.*

(Pet. App. A, Ex. AAA (emphasis added).)

However, notwithstanding the fact that this last finding is not supported by some evidence, the Board's reliance on the nature of the crime and the opposition from the next of kin and the District Attorney provided a sufficient basis to deny parole under California law.  For that reason, the Board's decision to deny parole is not devoid of the quantum of some evidence required to satisfy due process.  Accordingly, the California Supreme Court's rejection of Hawks' due process claim did not result in a decision that was contrary to or involve an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the record.  28 U.S.C. § 2254(d)(1),(2).

United States District Court

For the Northern District of California

**2.    The Boards Continued Reliance on the Nature of the Offense Did Not Violate Hawks' Due Process Rights.**

In *Biggs*, the Ninth Circuit stated that the some evidence standard may be considered in light of the Board's decision-making process over time.  The *Biggs* court also noted that the Board's decision to deny parole "is one of 'equity and requires a careful balancing and assessment of the factors considered," and that "in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial" did not violate Biggs due process rights.  334 F.3d at 917.  The Ninth Circuit also stated that:

> [o]ver time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest. ...
>
> A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

*Id.* at 916-17; *cf. Dannenberg*, 34 Cal. 4th at 1094 ("sole reliance on the commitment offense might, in particular cases, violate" section 3041(a)'s "provision that a parole date 'shall normally be set' under 'uniform term principles, and might thus also contravene the inmate's constitutionally protected expectation of parole"); *Rosenkrantz*, 29 Cal. 4th at 682-83 ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

In issuing the note of caution in *Biggs,* regarding continued reliance on unchanging factors, the Ninth Circuit gave no guidance to district courts as to how they should evaluate such a claim. Nor does the *Sass* court's decision provide any further guidance, other than to note that "[u]nder AEDPA it is not our function to speculate how future parole hearings could proceed." *Sass*, 461 F.3d at 1129.  Recently, courts in this district have construed *Sass* to mean that the Ninth Circuit retreated from the statement in *Biggs* that a due process violation might result from continued reliance on unchanging factors. *See, e.g., Rose v. Kane*, 2006 WL 3251735 at *11 & n.19 (N.D. Cal. Nov. 2, 2006); *Paluzzi v. Kane*, 2006 WL 3020919 (N.D. Cal. Oct. 23, 2006).

20

**United States District Court**

For the Northern District of California

1    Before the Ninth Circuit issued its decision in *Sass*, courts had concluded that, if a petitioner

2    is denied parole at his or her first parole hearing, the due process concerns raised in *Biggs* were not

3    implicated.  *See, e.g.*, *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (finding that denial of

4    parole at first suitability hearing based, in part, on circumstances of offense was supported by some

5    evidence).  Similarly, courts concluded that no due process violation occurred where, although there

6    had been multiple hearings, the petitioner's due process challenge was raised in response to the first

7    time the Board's decision relied solely on the facts of the commitment offense.  *See, e.g.*, *Hudson v.*

8    *Kane*, 2005 WL 2035590, *9-10 (N.D. Cal. Aug. 23, 2005) (denial of parole at third parole hearing,

9    but first denial based solely on the commitment offense); *cf. Machado v. Kane*, 2006 WL 449146 at

10   *5-6 (N.D. Cal. Feb. 22, 2006) (construing *Biggs* court's statements regarding continued reliance on

11   unchanging factors as dicta, but finding no due process violation where petitioner did not

12   demonstrate he was denied parole repeatedly based on unchanging factors).

13       In contrast, in cases where the petitioner had multiple parole suitability hearings over a long

14   period of time and there were repeated denials of parole based solely on unchanging factors, courts

15   had concluded that a petitioner was denied due process and was entitled to relief.  *See, e.g.*, *Irons v.*

16   *Carey*, 358 F. Supp. 2d 936, 947 (2005) (finding due process violation in denial of parole at fifth

17   parole suitability hearing after petitioner had served sixteen years of seventeen years to life sentence

18   for second degree murder and met circumstances tending to indicate suitability for parole), *appeal*

19   *docketed*, No. 05-15275 (9th Cir. Feb. 17, 2005); *Johnson v. Finn*, 2006 WL 195159, *12 (E.D. Cal.

20   Jan. 19, 2006) (finding due process violation in Governor's determination to reverse Board's

21   decision finding petitioner suitable for parole, where reversal was made after twelfth parole

22   suitability hearing and after petitioner had served twenty-four years of sentence of life with the

23   possibility of parole and met circumstances tending to indicate suitability for parole), *report and*

24   *recommendation adopted* 2006 WL 2839910 (E.D. Cal. Sept. 29, 2006); *Masoner v. State*, No. 2004

25   U.S. Dist. LEXIS 9221 (C.D. Cal. Jan. 23, 2004) (finding due process violation based on Board's

26   "continued reliance" on pre-conviction factors to justify denial of parole suitability after petitioner

27   had served twenty-one years of fifteen years to life sentence for second degree murder, had

28   participated in therapy and self-help programming and had impeccable prison record).

21

United States District Court

For the Northern District of California

1  Recognizing that the *Sass* court stated that it is not "our function to speculate how future
2  parole hearings could proceed," the Court finds that Hawks' due process rights were not violated
3  when the Board denied parole at the November 2003 hearing.  At that time, Hawks had served 16
4  years of his sentence of fifteen years to life, with the two year enhancement for the use of the firearm.
5  He has had only three prior suitability hearings.  The Board's decisions to find Hawks unsuitable at
6  these earlier hearings were based on grounds in addition to the nature of the commitment offense.  At
7  the first hearing, the Board relied on Hawks's prior alcohol problem and unstable relationship with
8  his wife, in addition to the commitment offense.  At the second hearing, the Board relied on Hawks's
9  failure to fully participate in self-help programming, lack of remorse, lack of parole plans, and
10  moderate level of threat, in addition to the commitment offense.  At the third hearing, the Board
11  again relied on the nature of the commitment offense, as well as the fact that the victim's next of kin
12  and the District Attorney opposed release.

13  At the November 2003 hearing, the Board did rely primarily on the nature of the offense.
14  However, it also relied on opposition received from the District Attorney and the victims' next of
15  kin.  Thus, the Board did not rely *solely* on the commitment offense to deny Hawks parole.  The
16  Court notes that there are strong factors weighing in favor of finding Hawks' suitable for parole.
17  Hawks has no prior criminal history, he has strong support from his family and friends, as well as
18  viable plans for employment and housing on his release.  Further, the record shows that Hawks has
19  been a model prisoner.  He has no serious disciplinary reports in his file, has obtained no less than
20  three educational degrees, and has completed numerous programs while incarcerated.  Finally,
21  correctional officers and staff psychologists view him as an exceptional candidate for parole.

22  At some point, the facts of Hawks' commitment offense and opposition from others may not
23  have predictive value in determining whether Hawks currently is a threat to the public and unsuitable
24  for parole.  At such a time, continued reliance on those facts indeed may result in an arbitrary
25  decision by the Board.  That time has not yet come.  The Court concludes that the Board's decision
26  to deny parole at the November 2003 hearing did not violate Hawks' federal due process rights.
27
28

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  A separate judgment shall issue, and the Clerk of the Court shall close the file.

**IT IS SO ORDERED.**


Dated: November 21, 2006

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California